**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| VENUS RODRIGUEZ, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-7248 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| THE CITY OF CHICAGO; CHICAGO | ) | |
| POLICE SGT. JANET COMISKEY; | ) | |
| CHICAGO POLICE OFFICER RICARDO | ) | |
| VIRAMONTES; CHICAGO POLICE | ) | |
| DETECTIVE ANTHONY WOJCIK; | ) | |
| CHICAGO POLICE OFFICER GILBERT | ) | |
| ESCAMILLA; MR. C'S MIDWAY BAR, | ) | |
| INC.; and UNKNOWN CHICAGO POLICE | ) | |
| OFFICER JOHN DOE, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In her governing first amended complaint [239] ("Complaint"), Plaintiff Venus Rodriguez ("Plaintiff") brings suit against the City of Chicago ("City"), Chicago Police Sergeant Janet Comiskey ("Comiskey"), Chicago Police Officers Ricardo Viramontes ("Viramontes") and Gilbert Escamilla ("Escamilla"), Chicago Police Detective Anthony Wojcik ("Wojcik"), Mr. C's Midway Bar, Inc. ("Midway Bar"), and unknown Chicago Police Officer John Doe ("Doe") (collectively, "Defendants") for injuries arising out of Doe's alleged assault of Plaintiff at Midway Bar in 2015. Currently before the Court are motions to dismiss filed by Midway Bar [242] and by the City, Comiskey, Viramontes, Escamilla, and Wojcik [246]. For the following reasons, both motions, [242] and [246], are granted. The Court gives Plaintiff until September 3, 2021 to file a motion for leave to file a Second Amended Complaint, if she believes she can do so consistent with this opinion and Rule 11. Plaintiff must attach a copy of the proposed Second Amended

Complaint to her motion. If Defendants oppose the motion, they shall have until October 1, 2021 to file an opposition brief and Plaintiff shall have until October 22, 2021 to reply. If Plaintiff chooses not to file a motion for leave to file an amended complaint or if the Court denies any such motion, a final judgment will be entered dismissing Plaintiff's federal claims with prejudice and dismissing her state claims without prejudice and with leave to refile in state court.

## I.    Background

The following facts are drawn from the Complaint. All well-pled facts are presumed to be true for purposes of Defendants' motions to dismiss. See *White v. United Airlines, Inc.*, 987 F.3d 616, 620 (7th Cir. 2021). At the time of the events detailed in the Complaint, Plaintiff was a police officer employed by the Chicago Police Department ("CPD"). Defendants Viramontes and Escamilla were also CPD officers; Defendant Comiskey was a CPD sergeant; and Defendant Wojcik was a CPD detective. Plaintiff, Comiskey, and Escamilla are still employed by CPD. According to the Complaint, Wojcik has retired and Viramontes was terminated "in connection with [his] role in the cover-up of the murder of Laquan McDonald by fellow Chicago Police Officer Jason Van Dyke." [239] at 3. Defendant John Doe, whom Plaintiff has yet to identify nearly four years into this litigation, allegedly was also a "sworn Chicago Police Officer" at all times relevant to the Complaint. Defendant Midway Bar is an Illinois corporation operating a tavern at 4654 W. 63rd Street in Chicago.

On October 6, 2015, Plaintiff and a female companion, Terry Bray ("Bray"), visited Midway Bar. Plaintiff was off duty at the time. Bray "became engaged in a verbal confrontation with another patron of the bar" who, according to the Complaint, "had previously identified himself to the Plaintiff and to Ms. Bray as a Chicago Police Officer who worked in the 3rd District." [239] at 3. Doe was accompanied by an unidentified female. Emmett Ward ("Ward")

was the bartender at Midway Bar at the time of the altercation. Ward allegedly knew that Doe was a CPD Officer and a "regular" at the bar. Ward told Plaintiff and Bray that they had to leave to bar. As they were leaving, "Bray was physically assaulted by several male patrons of the bar," including Doe. Plaintiff, attempting to stop the assault, "grabbed a cell phone from the bar and told the assailants that she was recording them and that they were going to go to jail if they did not stop." *Id*. at 4. Doe's female companion then "confronted, physically threatened and assaulted Plaintiff." *Id*. Plaintiff "ended up on the floor in the back of the bar." *Id*. Doe, aided by Ward, assisted Doe's "female companion and held Plaintiff on the floor near a pinball machine in the rear of the bar." *Id*. While Plaintiff was restrained, Doe and his female companion "punched and beat … Plaintiff about the head and body." *Id*. Ward called 911. After the attack, "Plaintiff was physically led out of the bar where she waited for police to arrive." *Id*. Doe and his female companion "fled out the rear door" of the bar "before the police arrived." *Id*.

Viramontes and Escamilla arrived on the scene and found Plaintiff standing in front of the bar with visible injuries to her face. They remained in their police vehicle. Plaintiff told the officers that "she was an off-duty CPD officer," that she "had just been assaulted and beaten in the bar by an unknown male patron who had identified himself as an off-duty Chicago Police Officer assigned to the 003rd District and his female companion," and that "she had sustained injuries and requested to go to the hospital for medical attention." [239] at 5. Viramontes and Escamilla did not leave their vehicle and "never bothered to enter the ba[r] to see if the offenders were still on the scene." *Id*. Viramontes and Escamilla called for a supervisor. Comiskey arrived, along with two other uniformed patrol officers. As Plaintiff was telling Viramontes, Escamilla, and Comiskey that she wanted to press charges against Doe, "multiple witnesses walked [out] of the bar directly past the officers," who "completely ignored these witnesses, and never bothered to even enter the

bar." *Id*. The officers also allegedly "refused to act upon the Plaintiff's requests for medical attention," to call an ambulance, or to take Plaintiff to a hospital. *Id*. Instead, they "repeatedly attempted to persuade Plaintiff not to pursue a complaint against" Doe, telling her to "drop the matter" and "just let it go." *Id*. They made no attempt to conduct any investigation at the scene or learn Doe's identity.

According to the Complaint, Ward falsely told the officers that Plaintiff was the aggressor in the altercation with Doe. He did not tell them that Doe and his female companion had fled through the back of the bar. Ward also threatened to press criminal trespass charges against Plaintiff if she sought to press charges against Doe.

Instead of seeking medical attention for her, the Defendant officers transported Plaintiff to the 8th District police station. Plaintiff was interviewed by another (unidentified) Sergeant, who observed her demeanor and noted her injuries. The Sergeant initiated a Criminal Register ("CR") with the Independent Police Review Authority ("IPRA") with "Plaintiff as the victim of an assault and battery and an Unknown Off Duty Chicago Police Officer as the accused." [239] at 7. An evidence technician was also called to photograph and document Plaintiff's injuries. Eventually, Plaintiff's father arrived at the police station and took Plaintiff to the emergency room at McNeal Hospital, where she was treated for her injuries.

CPD assigned Defendant Wojcik to investigate the alleged battery of Plaintiff. The complaint alleges that Wojcik failed or refused to conduct an investigation, allegedly "based on the false assertion that the bar video" of the incident "was 'inconsistent' with Plaintiff's allegations against … Doe." [239] at 8. Wojcik did not make any effort to identify or locate Doe, such as by showing anyone at the 3rd District a screen shot taken from the bar video of Doe or showing Plaintiff photos of the police officers who worked in the 3rd District. He also failed to prepare a

closing report on his purported investigation. When Wojcik retired in 2016, he allegedly took Plaintiff's file home with him.

The complaint further alleges that IPRA conspired to protect Doe and the City by refusing to make any attempt to identify Doe or conduct a legitimate investigation of Plaintiff's complaint. IPRA never took a sworn statement from Plaintiff. Within two weeks of the incident, IPRA, acting through Maria Elena Olvera ("Olvera") and Andrea Stoutenborough ("Stoutenborough"), reversed the CR and changed Plaintiff from "Complainant" to "Accused." Olvera and Stoutenborough, along with IPRA employee Kym Reynolds ("Reynolds"), "falsely characterized Plaintiff as the aggressor" and brought four charges against her, including a "Rule 14 Violation" for allegedly making a false police report. [239] at 9. IPRA also allegedly falsely charged Plaintiff with being intoxicated off duty, even though the Sergeant who initiated the CR told IPRA investigators that Plaintiff was not intoxicated. IPRA entered its findings on October 22, 2015, after interviewing only one witness—Ward, who knew Doe as a "regular"—and without watching the entire bar video of the incident. At the time IPRA made its findings, Plaintiff "had not been notified that she had become the 'Accused' in the CR originally lodged on her behalf." [239] at 9. Plaintiff was never provided "any justification or reason by IPRA or COPA for the change in her status from Complainant to Accused in the same CR." *Id*. at 10.

On December 22, 2015, Plaintiff received a call from CPD's Bureau of Internal Affairs ("BIA") informing her that she was being stripped of her police powers and instructing her to bring her badge and gun to police headquarters. On January 12, 2016, "IPRA's request to strip Plaintiff of her police powers was rejected by acting Chief of Police John Escalante." [239] at 9.

IPRA was disbanded in 2017 and replaced with the Civilian Office of Police Accountability ("COPA"), which, according to the Complaint, "employed many of the same individuals." [239]

at 10.  COPA never investigated the alleged assault of Plaintiff.  The complaint alleges that IPRA and COPA's investigations were deficient because they failed to take Plaintiff's sworn statement prior to labeling her the Accused; they failed to make any effort to identify Doe; they did not attempt to identify any of the other patrons of the bar at the time of the incident who were shown on video with Doe; they charged Plaintiff with being intoxicated despite the sworn testimony of the 8th District sergeant to the contrary; they charged Plaintiff with making a false police report and engaging in verbal and physical altercations with Doe's female companion "based upon a contrived interpretation of only one of the videos" from the bar; and they failed to watch all of the available bar video.  *Id*. at 11.

Finally, on December 17, 2019—more than four years after the incident—COPA issued its Final Summary Report, which sustained two of the four charges against Plaintiff: engaging in a verbal altercation with an unknown female and engaging in a physical altercation with an unknown female.  The Final Summary Reported recommended that Plaintiff be suspended for thirty days, which is "the highest possible penalty that cannot be appealed to the Review Board." [239] at 11. To date, Plaintiff has not been formally advised of the findings, the basis for them, or the disciplinary recommendation; she also has not been informed when the thirty-day suspension will go into effect.

Plaintiff alleges that the improper conduct of the Defendant CPD officers and the "sham" investigations of CPD, IPRA, and COPA were all "motivated by a culture of protection among Chicago Police Officers commonly referred to as a 'Code of Silence.'" [239] at 13.  The complaint details a number examples of how the code of silence has been used to cover up police misconduct and shield fellow officers from any punishment.  See *id*. at 13-15.  It also cites to reports from the City's Police Accountability Task Force ("PATF") and the U.S. Department of Justice ("DOJ")

recognizing that a code of silence exists within CPD. See *id*. at 14-15. The complaint alleges that the City "has acted with deliberate indifference to this code of silence despite notice of the practice through external complaints, threatened and actual lawsuits, and government-commissioned reports." *Id*. at 15. According to the complaint, "[t]hese systemic flaws not only result in a failure to hold CPD officers accountable for instances of misconduct, but also signal to officers that they can engage in misconduct whether on or off duty, with little to no risk that their actions will result in discipline." *Id*.

Based on these factual allegations, Plaintiff asserts a Section 1983 *Monell* claim against the City (Count I); a Section 1983 First Amendment retaliation claim against the City and the individual CPD Defendants (Count II); a conspiracy claim against the CPD Defendants, Midway Bar, and "other agents/employees" of the City under both Section 1983 and Illinois common law (Count III); a Section 1983 claim for deprivation of right of access to the courts (Count IV); a state law claim for assault and battery against Doe (Count V); a negligence claim against Midway Bar (Count VI); a claim against the City for violation of the Illinois Whistleblower Act (Count VII); and an indemnification claim against the City (Count VIII). Plaintiff seeks compensatory and punitive damages, attorneys' fees, and any other relief the Court deems appropriate.

The Court notes that in several places in the Complaint, Plaintiff suggests she is bringing suit against Defendants who were not named in her original complaint, including IPRA and/or COPA employees Stoutenborough, Reynolds, Olvera, and Fairley. However, these four individuals are not named in the caption of the Complaint or listed as parties, and the docket sheet indicates that Plaintiff has never attempted to serve them. As a result, they have not entered appearances, are not represented by counsel, and have not responded to the Complaint. "A district court may not exercise personal jurisdiction over a defendant unless the defendant has been

properly served with process, and the service requirement is not satisfied merely because the defendant is aware that he has been named in a lawsuit or has received a copy of the summons and the complaint." *United States v. Ligas*, 549 F.3d 497, 500 (7th Cir. 2008); see also *United States v. Park*, 389 F. Supp. 3d 561, 567 (7th Cir. 2019). Therefore, unless and until Plaintiff properly names and serves these individuals, the Court will not consider them to be parties to the lawsuit.

## II.    Legal Standard

Federal Rule of Civil Procedure 8(a)(2) provides that, to state a claim for relief, a complaint "must contain … a short and plain statement of the claim showing that the pleader is entitled to relief." "The questions under [this rule] are whether the defendant has fair notice of what he must defend himself against and whether there is some reason to believe he could be found liable at the end of the case." *Williams v. Dart*, 967 F.3d 625, 638 (7th Cir. 2020). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts which, when taken as true, "'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007)). For purposes of a motion to dismiss under Rule 12(b)(6), the Court "'accept[s] as true all of the well-pleaded facts in the complaint and draw[s] all reasonable inferences in favor of the plaintiff.'" *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2018) (quoting *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016)). However, this "tenet … is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678, which "can [be] reject[ed] at the motion to dismiss stage." *Dix v. Edleman Financial Services, LLC*, 978 F.3d 507, 514 (7th Cir. 2020).

The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011). The Court may also consider "documents that are

attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *O'Brien v. Village of Lincolnshire*, 955 F.3d 616, 621 (7th 2020). In opposing a Rule 12(b)(6) motion, a plaintiff is "free to 'elaborate on … factual allegations so long as the new elaborations are consistent with the pleadings.'" *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 753 n.2 (7th Cir. 2021) (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)). However, a plaintiff may not use her response to a motion to dismiss to amend the complaint. See *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co*., 631 F.3d 436, 448 (7th Cir. 2011); *Liqui-Box Corp. v. Scholle IPN Corp*., 449 F. Supp. 3d 790, 804 (N.D. Ill. 2020).

## III. Analysis

### A. First Amendment Retaliation

In Count II of the Complaint, for First Amendment retaliation, Plaintiff alleges that she "engaged in extensive protected speech on matters of public concern by reporting on the criminal misconduct of … Doe to Defendants, the Bureau of Internal Affairs, IPRA and others." [239] at 18. As a result, Plaintiff alleges, Defendants "retaliated against [her] in the manner described" in the Complaint's factual summary. *Id*. Plaintiff alleges that the retaliation was "devised, approved and carried out by individuals with final policymaking authority with respect to the actions taken, including but not limited to, lodging an IPRA investigation against … Plaintiff." *Id*. According to the Complaint, Defendants' misconduct was the result of the City's "code of silence," which policymakers condone and facilitate by retaliating against officers who report the misconduct of other officers, among other actions. See *id*. at 18-19.

"To establish a prima facie case of unlawful retaliation, a plaintiff must show '(1) [s]he engaged in activity protected by the First Amendment; (2) [s]he suffered a deprivation that would

9

likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action.'" *Douglas v. Reeves*, 964 F.3d 541, 546 (7th Cir. 2009) (quoting *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)). "These basic elements are the same whether the plaintiff is a prisoner, a public employee, or any other person alleging that a government official targeted protected activity." *Id*. However, "the specific contours of each element can vary depending on the context." *Id*. Plaintiff, as a CPD officer, is a "public employee" who "by necessity must accept certain limitations on … her freedom." *Garcetti v. Caballos*, 547 U.S. 410, 418 (2006). In order for her speech to be protected by the First Amendment, she "must demonstrate that '(1) [s]he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) h[er] interest in expressing that speech was not outweighed by the state's interests as an employer in 'promoting effective and efficient public service.'" *Davis v. City of Chicago*, 889 F.3d 842, 845 (7th Cir. 2018) (quoting *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013)); see also *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008). The determination of whether speech is constitutionally protected is a question of law for the Court. *Id.* at 489.

The Court agrees with Defendants that, as currently pled, Plaintiff's First Amendment retaliation claim is deficient because it is not premised on speech that is protected by the First Amendment. The Complaint relies on two categories of speech: Plaintiff's statements to IPRA, COPA and Wojcik, and her statements to the Defendant officers who responded to Midway Bar.

Defendants argue that Plaintiff made her statements to Wojcik, IPRA and COPA as part of her official duties as a police officer, rather than as a private citizen. "'[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes.'" *Vose v. Kliment*, 506 F.3d 565, 569 (7th Cir. 2007) (quoting *Garcetti*

*v. Ceballos*, 547 U.S. 410, 421 (2006)). "Determining the official duties of a public employee requires a practical inquiry into what duties the employee is expected to perform, and is not limited to the formal job description." *Id.*; see also *Kubiak v. City of Chicago*, 873 F.3d 962, 967 (7th Cir. 2017). In support of their position that Plaintiff's statements to IPRA, COPA and Wojcik were not made as a private citizen, Defendants rely on number of cases in which the Seventh Circuit affirmed the dismissal of First Amendment retaliation claims that were premised on internal complaints made by police officers, including *Vose*, *Kubiak*, *Houskins*, and *Forgue v. City of Chicago*, 873 F.3d 962 (7th Cir. 2017).

In *Forgue*, which the Court finds most instructive here, the Seventh Circuit determined that the Plaintiff CPD officer's complaints to IPRA concerning CPD officers' treatment of his two sons—who were repeatedly stopped, arrested, handcuffed or detained based on false reasons— were made as in his capacity as a public employee rather than a private citizen. 873 F.3d at 965, 967. The court rejected Plaintiff's argument that his complaints were made "as a concerned citizen and father outside of his employment duties." *Id*. at 967. The court explained that "[w]e have held on several occasions that 'a police officer's duty to report official police misconduct is a basic part of the job.'" *Id*. (quoting *Roake v. Forest Pres. Dist. of Cook County*, 849 F.3d 342, 346 (7th Cir. 2017)). The Court further noted that "CPD General Order G08–01–02 … mandates police officers 'to notify their superiors when they observe instances of police misconduct.'" *Id*. at 967 (quoting the General Order to require "[m]embers who have knowledge of circumstances relating to misconduct [to] submit an individual written report to a supervisor"); see also *Kubiak*, 810 F.3d at 481-84 (police officer failed to allege facts suggesting that she was speaking as a private citizen when she reported to supervisor that another officer verbally assaulted her regarding a work-related report, where she was expected to report officer misconduct as part of her job duties); *Roake*, 849

F.3d at 346-47 (speech by police officer for county forest preserve district, internally reporting about alleged racial profiling and unlawful disciplinary action within police force, was made pursuant to his official responsibilities, and not as citizen); *Houskins*, 549 F.3d at 491 (county corrections department's social worker's internal complaint to department's internal affairs division, alleging that she had been assaulted by corrections officer in parking lot, was speech made pursuant to social worker's official duties, not made as a citizen); *Vose*, 506 F.3d at 569 (police officer was speaking pursuant to his official duties as supervisor of police department's narcotics unit, rather than as a citizen, when he spoke with chief of police and deputy chief of police about apparent misconduct committed by detectives in department's major case unit).

Plaintiff attempts to distinguish this line of cases on the basis that she was off duty when she was allegedly assaulted by Doe. See [260] at 5-6. But the Seventh Circuit's decision in *Forgue* undermines her argument. Officer Forgue's complaints did not concern anything that he observed or learned while on duty; he was not even present on the many occasions other officers allegedly harassed his sons. Yet his complaints concerning the treatment of his sons were nonetheless considered by the Seventh Circuit to be within the scope of his official duties. See *Forgue*, 873 F.3d at 967. The Court has also considered the potential relevance of the fact that Doe was off duty at the time of the incident, as well. Although Plaintiff does not raise the issue in response to the motion to dismiss, she might have questioned whether his conduct should be considered "official misconduct" as that term is used in the case law requiring police officers to internally report the misconduct of other officers. However, that argument appears to be a non-starter too. Any such argument would be inconsistent with Plaintiff's decision to resort to COPA and IPRA in an effort to have Doe disciplined for his off-duty conduct. Further, the Complaint's recitation of facts—including that Plaintiff was investigated by IPRA and COPA for her own off-duty

12

conduct at Midway Bar and a 30-day suspension was recommended—strongly suggests that officers *are* subject to discipline for misconduct they commit while off duty.

Defendants next argue that Plaintiff's statements to the officers who responded to Midway Bar are not constitutionally protected because they did not relate to matters of public concern. The Court agrees, and extends the same conclusion to Plaintiff's complaints to IPRA, COPA and Wojcik. "Speech that serves a private or personal interest, as opposed to a public one, does not satisfy the standards for First Amendment protections." *Houskins*, 549 F.3d at 490-91. "'The relevant inquiry is not whether the public would be interested in the topic of the speech at issue but rather is whether the purpose of the plaintiff's speech was to raise issues of public concern.'" *Id.* at 492 (quoting *Boyce v. Andrew*, 510 F.3d 1333, 13344 (11th Cir. 2007)). As in *Houskins*, Plaintiff's statements to the responding officers, as well as to IPRA, COPA and Wojcik, were "nothing more than [Plaintiff's] personal grievances against [Doe] in order to have him arrested" and disciplined for allegedly assaulting her. *Houskins*, 549 F.3d at 492 (police report did not involve matter of public concern); see also *Kubiak*, 810 F.3d at 481-84 (police officer failed to allege facts suggesting that she was speaking on a matter of public concern when she reported to her supervisors and Internal Affairs Division that another officer verbally assaulted her regarding a work-related report, where she reported incident out of concerns for her own safety, rather than public safety); [239] at 5 (Plaintiff told Viramontes, Escamilla, and Comiskey she wanted to press charges against Doe); *id.* at 8 (Plaintiff contacted IPRA and Wojcik to "find out the status of the investigation" and find out "what effort [Wocjik] was making to identify Doe").

In response, Plaintiff argues that while she "undoubtedly wanted Doe and his female companion arrested and prosecuted for attacking her, Plaintiff's complaints encompass how the City's Code of Silence influenced every aspect of these purported 'investigation(s).'" [260] at 7.

But nothing in the Complaint suggests that, when Plaintiff spoke to the Defendant officers about filing a criminal complaint against Doe, or to Wojcik and IPRA/COPA about the status of their investigations, she also raised concerns about the "code of silence." The first time those concerns were raised—at least as far as the Court can gather from the Complaint—was when Plaintiff filed the instant lawsuit in 2017. "'It is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'" *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 348 (7th Cir. 2012) (quoting *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989)).

In her response to the motion to dismiss, Plaintiff identifies a third category of speech that she claims is protected by the First Amendment: her filing of the instant lawsuit and, in particular, its allegations concerning Defendants maintaining a "code of silence." See [260] at 6 (arguing that Plaintiff's "filing of the original lawsuit in October of 2017 … detailed Plaintiff's reporting of misconduct and the wide range of serious retaliatory actions she suffered as a result" and therefore "cannot be considered as part of her official duties as a public employee"). "A lawsuit may … be a form of protected speech." *Sneed v. City of Harvey*, 6 F. Supp. 3d 817, 839 (N.D. Ill. 2013). However, Plaintiff's filing of the instant lawsuit in not one of the bases on which her First Amendment claim rests, at least as it is currently pled. See [239] at 18. This claim cannot be amended through Plaintiff's response to the motion to dismiss. See *Agnew*, 683 F.3d at 348; *Perelli*, 631 F.3d at 448. Further, it is not apparent how any of the individual City Defendants could be held responsible for retaliating against Plaintiff for filing the instant lawsuit in 2017, when their involvement with Plaintiff occurred around the time of the alleged assault in 2015. To the extent that Plaintiff wants to file a First Amendment retaliation claim premised on her filing of this lawsuit as the relevant "protected speech," she will need to file a motion for leave to file a second amended complaint laying out this theory. If Plaintiff chooses to do so, she should also include

14

the status of the thirty-day suspension that COPA allegedly recommended, so that the Court can better assess arguments concerning whether, subsequent to and because of her filing of the lawsuit, Plaintiff suffered any harm as the result of any acts that could plausibly be considered retaliatory.

**B.     Denial of Access to Courts**

In Count IV of the Complaint, for deprivation of access to the courts, Plaintiff alleges that the City, through the Defendant officers, and IPRA and COPA, through their employees, "individual and jointly failed and/or attempted to prevent or suppress the disclosure of the identity of Defendant Officer Doe." [239] at 21.  Further, they allegedly "attempted to cover-up and/or suppress the identity of Defendant Officer Doe as well as … Doe and/or [the City's] liability into the October 6, 2015 beating of the Plaintiff."  *Id.* at 22.  Plaintiff alleges that this has "worked to deprive [her] of access to critical information" and "the ability to properly investigate and prosecute her claims against … Doe."  *Id.*  Plaintiff asserts that the City Defendants' "official cover-up was rooted in a concerted and unremitting abuse of power and authority, and it was undertaken … with the intent or knowledge that it would obstruct the legitimate efforts of Plaintiff to hold … Doe accountable through judicial redress, or with reckless disregard for same."  *Id.*

"The First and Fourteenth Amendments protect the rights of individuals to seek legal redress for claims that have a reasonable basis in law and fact."  *Rossi v. City of Chicago*, 790 F.3d 729, 734 (7th Cir. 2015) (citing *Christopher v. Harbury*, 536 U.S. 403, 414-15 (2002)).  "A corollary of this right is the freedom from police interference with access to court, such that an officer's intentional concealment of 'the true facts about a crime may be actionable as a deprivation of constitutional rights under [42 U.S.C.] § 1983.'"  *Harer v. Casey*, 962 F.3d 299, 306 (7th Cir. 2020) (quoting *Rossi*, 790 F.3d at 734); see also *Vasquez v. Hernandez*, 60 F.3d 325, 328 (7th Cir. 1995) ("when police officers conceal or obscure important facts about a crime from its victims

rendering hollow the right to seek redress, constitutional rights are undoubtedly abridged"); cf. *Bell v. City of Milwaukee*, 746 F.2d 1205, 1261 (7th Cir. 1984) (constitutional right of judicial access "is lost where … police officials shield from the public and the victim's family key facts which would form the basis of the family's claims for redress"). However, an individual "does not have a constitutional right to have the police investigate his case at all, still less to do so to his level of satisfaction." *Rossi*, 790 F.3d at 735; see also *Harer*, 962 F.3d at 306. "Put another way, 'mere inactivity by police does not give rise to a constitutional claim.'" *Harer*, 962 F.3d at 306 (quoting *Rossi*, 790 F.3d at 735). "For this reason, the operative question is not whether [the individual's] case would have been better had the police conducted a worthy investigation, but whether their failure to do so limited his ability to obtain legal redress to such degree that it constituted a denial of judicial access." *Rossi*, 790 F.3d at 735. In addition, an individual does not have a claim for denial of access where the police "did not conceal any facts about the incident that were not already known to" the individual. *Id.* at 736. In sum, "the road to relief for a backward-looking access-to-court claim * * * is an exceedingly narrow one." *Harer*, 962 F.3d at 307.

Applying the case law to the facts alleged in the Complaint, the Court concludes that Plaintiff fails to state a claim for denial of access to the Courts. The Complaint does not contain any allegations that, viewed in the light most favorable to Plaintiff, plausibly suggest that Defendants intentionally concealed what happened between Plaintiff and Doe at Midway Bar in a manner that resulted in Plaintiff being unable to pursue a criminal complaint or a civil assault and battery claim against Doe. *Harer*, 962 F.3d at 306. As a participant in and eyewitness to the altercation at Midway Bar, the only key fact *not* known to Plaintiff is Doe's identity. But there is nothing in the Complaint to suggest that any of the Defendants know Doe's identity, either, yet

16

have concealed it from her. Indeed, according to the Complaint, Doe and his female companion had already fled out the rear door of the bar before police arrived at the scene. [239] at 4. There are no allegations in the Complaint suggesting any reason why any of the Defendants should have known Doe personally or known about his involvement in an altercation with Plaintiff. For instance, Plaintiff does not claim that the responding officers worked in the same District as Doe, or were told anything by any witnesses (such as Ward) that would have revealed Doe's identity. Rather than identifying any facts that were intentionally concealed from her, *Harer*, 962 F.3d at 306, Plaintiff focuses on the City Defendants' failure to conduct an investigation to reveal the one fact she did not already know: Doe's identity. See [260] at 14 (Plaintiff's response to the motion to dismiss arguing that Defendants used "a deliberate strategy of inaction"); *id.* (emphasizing that Defendant officers "allow[ed] well over 20 eyewitnesses to leave the scene without getting out of their squad car or taking a single name").

Plaintiff emphasizes that Defendants' failure to identify Doe must be viewed in a broader context, which "shows the all-hands-on-deck power of the City to protect one of its own and punish one of its own for attempting to speak out." [260] at 16-17. Plaintiff points out that the responding officers failed to get her medical attention, *id.* at 15, and that she "had to endure a sham IPRA investigation for over four years based on fabricated allegations of misconduct," including false allegations that she was intoxicated and "a false Rule 14 allegation that Plaintiff made a false police report the night of her attack." *Id.* at 16. Plaintiff also emphasizes that as a result of speaking out against Doe, her "reward" has been a (recommended) thirty-day suspension. *Id.* Troubling as these allegations are, however, they do not plausibly support a conclusion that Defendants deprived Plaintiff of the ability to access the courts "to seek redress" against Doe. *Vasquez*, 60 F.3d at 328. To the extent that IPRA and COPA's alleged "sham" findings might undermine Plaintiff's

credibility in a criminal or civil action against Doe, they did not "conceal or obscure" anything from Plaintiff, *id.*, who has known all along whether she was injured, intoxicated, or provided any false information to the responding officers on the night in question.

The Court has reviewed all of the case law cited by Plaintiff and conducted its own research, yet has not found any case in which a denial of access claim has succeeded on facts similar to this case, which is based on (1) defendants' failure to conduct an investigation to identify a Doe who is unknown to the plaintiff, coupled with (2) misconduct not involving the concealment of the Doe's identity or any other key information not already known to the plaintiff. Rather, in the cases in which plaintiffs have prevailed (either at the motion to dismiss, summary judgment, or trial stage), success depended on the plaintiff being able to plead or present evidence that the defendants' concealment of known, important facts prevented the plaintiff from gathering the information needed to obtain redress in the courts.

In *Stone v. City of Chicago*, 738 F.2d 896 (7th Cir. 1984), the Court upheld a jury verdict in plaintiff's favor on a denial of access claim in a case involving police officers who negligently struck Stone with their police car while Stone was riding a bicycle. The plaintiff presented evidence that a group of police officers conspired to cover up two of the officers' involvement in the car accident, and also conspired to cover up other officers' use of excessive force in arresting plaintiff and his wife following the accident. This evidence included that all of the officers were huddled together at an intersection conversing following the accident; that several of the officers made racial slurs against plaintiffs; that the official police reports of the incident omitted reference to a police car being involved in the accident; that the officers failed to report hit-and-run allegations to the appropriate authority; and that none of the officers took names of witnesses who might have seen the application of excessive force. See *id.* at 900.

18

In *Thomas v. City of Blue Island*, 178 F. Supp. 3d 646 (N.D. Ill. 2016), the court denied a motion to dismiss denial of access and conspiracy claims brought by the mother of a minor child who was killed by a hit-and-run driver while sledding. The court determined that the plaintiff's claims were plausible where she alleged that two police officers engaged in "active concealment and cover-up" of information that prevented her from discovering the identity of the driver. *Id.* at 652. According to the complaint, the officers identified a person-of-interest, who had personal and political connections with the officers and the police department, and conducted a polygraph test of that person's girlfriend. The polygraph was inconclusive. Nonetheless, one of the officers authorized a report stating—and told plaintiff's mother—that the girlfriend "passed the polygraph" and was "telling the truth." *Id.* at 650. On that basis, the police department abandoned the investigation and the case went cold for years, until Plaintiff asked a police detective to take a fresh look at her case. Plaintiff did not learn of the original investigating officers' cover-up until the detective filed a whistleblower action over nine years after plaintiff's son's death. *Id.* at 650-52.

In *Klinger v. City of Chicago*, (N.D. Ill. Feb. 24, 2017), the Court denied a motion to dismiss a denial of access claim that was based on the following facts. Following the annual Chicago St. Patrick's Day parade, Plaintiff was attacked by a man in a kilt who was wearing a police star around his neck. Plaintiff flagged down a CPD officer, Officer Maas, who spoke with the assailant and told him to leave the scene by getting back onto his party bus. *Id.* at *2. Maas prepared a report listing the assailant by the fictitious name "Officer O'Dublan" and failed to obtain the assailant's correct name, star number, or contact information. The report stated that "O'Dublan" observed Plaintiff and an unknown offender "engaged in an altercation," and not that "O'Dublan" was the alleged assailant. *Id.* at *2. Plaintiff filed suit against the City of Chicago, Maas, and "Officer O'Dublan" (among others). Defendants delayed for over a year and a half in

responding to discovery to identify "Officer O'Dublan." In the meanwhile, Plaintiff learned through a third party that shortly after the incident, IPRA had conducted an investigation and learned that "O'Dublan" was actually a Will County Sheriff's Deputy named Matthew Griebel. *Id*. at *3. That report should have been turned over in discovery if Defendants had not been obstructive. The district court held that "Plaintiff's allegations, if true, support a claim that the actions of the City of Chicago Defendants hindered Plaintiff's efforts to pursue a nonfrivolous state law tort claim against Defendant Griebel by hiding Griebel's identity from her." *Id*. at *11.

In *Rainey v. City of Chicago*, 2013 WL 941968 (N.D. Ill. Mar. 11, 2013), the district court denied a motion to dismiss the plaintiff's denial of access claim, which was based on the defendant officers' alleged conspiracy to cover up certain of the officers' alleged use of force in arresting plaintiff. "Plaintiff testified that he covered his face to protect it during an attack, and was therefore unable to identify which officers were harming him and the extent of their involvement." *Id.* at *12. The court determined that "the absence of accurate information in the police reports and complaints about who arrested [Plaintiff] and why undoubtedly hindered Plaintiff in his attempts to hold Defendants responsible for the excessive force he alleges they used against him." *Id.*

In *McDorman v. Smith*, 2005 WL 1869683 (N.D. Ill. Aug. 2, 2005), the district court denied a motion to dismiss a denial of access claim based on officers' alleged conspiracy to conceal the identity of an off-duty CPD officer, Officer Sanchez, who was involved in a traffic accident that left plaintiff "seriously injured and unconscious." *Id*. at *1, 3-4. In that case, the responding officers allegedly knew that Sanchez was driving the other vehicle and was intoxicated at the time, but issued a report identifying the driver of the other vehicle as "unknown." *Id*. at *1. Cf. *LaPorta v. City of Chicago*, 102 F. Supp. 3d 1014, 1023 (N.D. Ill. 2015) (Plaintiff sufficiently stated a claim that city deprived him of his right of access to the courts by concealing incidents of police

20

misconduct, which prevented him from pursuing his *Monell* claim, where plaintiff alleged city withheld key factual ingredients he needed to state such claim—such as that defendant officer "had more than a dozen CRs filed against him, that the City employed hundreds of officers with similarly long histories of alleged misconduct, and that the City failed to investigate misconduct"—resulting in significant delay); *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 296-98 (3d Cir. 2018) (genuine issue of material fact existed as to whether police officers agreed with one another to misrepresent facts of arrest, precluding summary judgment on arrestee's § 1983 claim for after-the-fact conspiracy violating due process in connection with allegation that officer kicked him in face, breaking his nose and eye socket; material omissions in contemporaneous police reports could reasonably be seen by a jury as evidence that the officers agreed to abide by a claim about what happened and agreed to represent it falsely, thereby participating in a conspiracy after the fact).

In contrast to this line of cases, the Complaint in this case contains no allegations that plausibly suggest that any of the City Defendants ever knew the "key fact" or "truth" of Doe's identity, yet concealed it from Plaintiff. *Bell*, 746 F.2d at 1261. As noted above, the Complaint alleges that Doe had already fled out of the back door of the bar before any officers arrived on the scene. See [239] at 4. The Complaint does not contain any facts suggesting that the City Defendants at any point have discovered Doe's identity, or evidence that would point them to Doe's identity, yet kept it from Plaintiff. And Plaintiff has received through discovery the same evidence that was available to the responding officers and other City Defendants—who, unlike Plaintiff, never saw Doe face-to-face or had any first-hand knowledge of what occurred at Midway Bar on the night of October 6, 2015. Viewed as a whole, Plaintiff's allegations in support of her denial of access claim boil down to a complaint that the City Defendants failed to conduct an

adequate investigation to uncover Doe's identity. This is insufficient to state a viable claim for denial of access. See *Rossi*, 790 F.3d at 735; *Lopez v. Sheriff of Cook County*, 2020 WL 1530739, at *10 (N.D. Ill. 2020) ("there is no generalized constitutional right to have the police investigate one's case").[1] As in *Harer*, "[t]he filing of a case undermines the argument that an individual lacks access to court." 962 F.3d at 310; see also *id.* at 312 ("At bottom the Harers' backward-looking access-to-court claim is untenable because their underlying tort claims are timely, facially plausible, and still pending").

### C. *Monell*

Count I of the Complaint is a Section 1983 *Monell* claim asserting that the City Defendants' misconduct was "done pursuant to one or more … *de facto* policies, practices, and/or customs of the City," including "suppressing officer misconduct"; "investigating complaints against off duty officers differently than complaints against other citizens"; hiring and retaining unqualified officers and failing to properly train, monitor, and supervise officers; and maintaining a "code of silence." [239] at 15-17.

"Municipalities do not face *respondeat superior* liability under section 1983 for the misdeeds of employees or other agents. Only actions of the entity will suffice." *Flores v. City of*

---

[1] The Seventh Circuit has explained that "judicial access" within the meaning of the "right of individuals to pursue legal redress" protected by the First and Fourteenth Amendments "must be 'adequate, effective, and meaningful.'" *Vasquez*, 60 F.3d at 328. It is difficult to comprehend how a case that has proceeded for nearly four years and has generated 300 docket entries and consumed years of discovery supervision by the assigned Magistrate Judges could provide anything less than "adequate, effective, and meaningful" access to the courts. Moreover, during the time since the incident at the bar, Plaintiff easily could have—and presumably has—replicated many aspects of the police investigation that she finds wanting. For example, she could have requested photos of the 3rd District police officers as of the date of the incident who might plausibly fit her description of Doe. Based on her own observations, Plaintiff should be able to narrow the potential field considerably by eliminating for consideration any officers whose race, gender, size, or other characteristics do not match her memory of Doe. She might also have sent an investigator to the bar, at which by her own allegations Doe was a regular, to see if he would turn up again so the investigator could get a picture or additional identifying characteristics to aid in the task of identifying his name and confirming that he was in fact a police officer.

*South Bend*, 997 F.3d 725, 731 (7th Cir. 2021); see also *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 691 (1978). "Accordingly, to prevail on a § 1983 claim against a municipality under *Monell*, a plaintiff must challenge conduct that is properly attributable to the municipality itself." *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (citing *Board of County Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997)). The Seventh Circuit has "interpreted this language to include three types of actions that can support municipal liability under § 1983: '(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.'" *Id.* (quoting *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)).

"[A] municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010); see also *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021) ("A *Monell* plaintiff must establish that he suffered a deprivation of a federal right before municipal fault, deliberate indifference, and causation come into play."); *Swanigan v. City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015) ("If the plaintiff fails to prove a violation of his constitutional rights in his claim against the individual defendants, there will be no viable *Monell* claim based on the same allegations."). For the reasons explained in the preceding sections, Plaintiff has failed to allege that Defendants' actions violated her constitutional rights. Therefore, Plaintiff's *Monell* claim against the City must also be dismissed.

### D.  Conspiracy

In Count III of the Complaint, Plaintiff asserts a conspiracy claim against the CPD Defendants, Midway Bar, and "other agents/employees" of the City under both Section 1983 and Illinois common law.  Plaintiff alleges that these Defendants conspired to violate her constitutional rights and intimidate and deter her from pursuing an internal investigation, citizen complaint, or criminal charges against Doe.  See [239] at 20.

"To establish conspiracy liability in a § 1983 claim, the plaintiff must [allege] that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights."  *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015); see also *Sánchez v. Village of Wheeling*, 447 F. Supp. 3d 693, 705 (N.D. Ill. 2020).  "In Illinois, plaintiffs may prove a civil conspiracy claim by showing: '(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act.'"  *Inteliquent, Inc. v. Free Conferencing Corp.*, 503 F. Supp. 3d 608 (N.D. Ill. 2020) (quoting *Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. Sup. 2004)).

"Section 1983 conspiracy claims are derivative; they cannot stand alone."  *Campos v. Cook County*, 932 F.3d 972, 975 (7th Cir. 2019).  Thus, "a plaintiff cannot bring a § 1983 claim for conspiracy to deny a civil right unless the plaintiff states an underlying claim for denial of a right."  *Id.*; see also *Dix v. Edelman Financial Services, LLC*, 978 F.3d 507, 518 (7th Cir. 2020) ("a plaintiff must allege and prove both a conspiracy and an actual deprivation of rights; mere proof of a conspiracy is insufficient to establish a section 1983 claim" (internal citation and quotation marks omitted)).  Likewise, civil conspiracy is not a separate cause of action under Illinois law.

*Horist v. Sudler & Co.*, 941 F.3d 274, 281 (7th Cir. 2019); see also *Summerland v. Exelon Generation Co.*, -- F. Supp. 3d --, 2020 WL 7771144, at *7 (N.D. Ill. Dec. 30, 2020).  As with a Section 1983 conspiracy claim, "if a plaintiff fails to state an independent cause of action underlying his conspiracy allegations, the claim for conspiracy also fails."  *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1159 (N.D. Ill. 2016) (internal quotation marks and citation omitted).  Since, for the reasons explained above, Plaintiff fails to state a viable claim for violation of her constitutional rights, Plaintiff's claim for conspiracy must also fail.  Count III of the Complaint is therefore dismissed.  To the extent that Plaintiff's conspiracy claim is premised on Illinois law, it is addressed in the next section of this opinion.

> ### E.    Remaining State Law Claims

With the dismissal of all of Plaintiff's Section 1983 claims, the only claims remaining in the case are state law claims for conspiracy against the CPD Officers and Midway Bar (Count IV), assault and battery against Doe (Count V), negligence against Midway Bar (Count VI), violation of the Illinois Whistleblower act against the City (Count VII), and Indemnification against the City (Count VIII).  Where, as here, the state law claims are based on the supplemental jurisdiction of 28 U.S.C. § 1367 rather than the diversity jurisdiction of 28 U.S.C. § 1332, see [239] at 2, the "sensible presumption [is] that if the federal claims drop out before trial, the district court should relinquish jurisdiction over the state-law claims."  *Refined Metals Corp. v. NL Industries Inc.*, 937 F.3d 928, 935 (7th Cir. 2019) (internal quotation marks and citation omitted); see also *Black Bear Sports Group, Inc. v. Amateur Hockey Ass'n of Illinois, Inc.*, 962 F.3d 968, 972 (7th Cir. 2020) (explaining that when "the federal claim fails, any state-law claims belong in state court" (citing 28 U.S.C. § 1367(c)(3))).  Nonetheless, "'judicial economy, convenience, fairness and comity may point to federal retention of state-law claims ... when it is absolutely clear how the pendent claims

can be decided.'" *Donald v. Wexford Health Sources, Inc*., 982 F.3d 451, 461 (7th Cir. 2020) (quoting *Wright v. Associated Ins. Cos. Inc*., 29 F.3d 1244, 1251 (7th Cir. 1994)).

The Court cannot conclude that it is "absolutely clear how the pendent claims can be decided." *Donald*, 982 F.3d at 461. The parties have not briefed the viability of Plaintiff's negligence claim against Midway Bar, as Midway Bar has not moved to dismiss that claim. The parties' briefing of Plaintiff's new Illinois Whistleblower Act claim raises complex issues of state law that an Illinois state court would be well suited to resolve, and Plaintiff's claims for civil conspiracy and indemnification are contingent (at least in part) on how that underlying claim is resolved. The assault and battery claim has not proceeded in any significant manner, either, as it is against a Defendant—Doe—who has yet to be identified or served. Therefore, the Court will follow the general rule and dismiss the state law claims. The Court notes that Illinois law gives Plaintiff one year from the dismissal on jurisdictional grounds of state law claims in federal court in which to refile those claims in state court. See 735 ILCS 5/13-217; see also *Sharp Electronics Corp. v. Metropolitan Life Ins. Co*., 578 F.3d 505, 514-15 (7th Cir. 2009); *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008).

## IV. Conclusion

For the following reasons, Midway Bar's motion to dismiss [242] and the City, Comiskey, Viramontes, Escamilla, and Wojcik's motion to dismiss [246] are both granted. The Court gives Plaintiff until September 3, 2021 to file a motion for leave to file a Second Amended Complaint, if she believes she can do so consistent with this opinion and Rule 11. Plaintiff must attach a copy of the proposed Second Amended Complaint to her motion. If Defendants oppose the motion, they shall have until October 1, 2021 to file an opposition brief and Plaintiff shall have until October 22, 2021 to reply. If Plaintiff chooses not to file a motion for leave to file an amended

complaint or if the Court denies any such motion, a final judgment will be entered dismissing Plaintiff's federal claims with prejudice and dismissing her state claims without prejudice and with leave to refile in state court.

Dated: August 5, 2021

_____
Robert M. Dow, Jr.
United States District Judge